EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Ileana Rodríguez García<br><br>Recurrida<br><br>v.<br><br>Universidad Carlos Albizu, Inc.<br><br>Peticionaria | Certiorari<br><br>2018 TSPR 148<br><br>200 DPR ____ |

Número del Caso: CC-2016-28


Fecha: 9 de agosto de 2018


Tribunal de Apelaciones:

 Región Judicial de San Juan


Abogados de la parte peticionaria:

 Lcdo. José González Nogueras
 Lcdo. Jorge Pizarro García


Abogadas de la parte recurrida:

 Lcda. Judith Berkan
 Lcda. Mary Jo Méndez Vilella.



Materia: Derecho Procesal Civil: Procedencia de una moción de sentencia sumaria. Obligaciones y Contratos: Eficacia de una resolución unilateral de un contrato de empleo por tiempo definido en virtud del lenguaje convenido por las partes mediante una cláusula resolutoria unilateral.



Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Ileana Rodríguez García | | |
|---|---|---|
| Recurrida | | |
| v. | **Núm.** CC-2016-0028 | |
| Universidad Carlos Albizu, Inc. | | |
| Peticionaria | | |

Opinión del Tribunal emitida por la Juez Asociada señora Rodríguez Rodríguez

En San Juan, Puerto Rico, a 9 de agosto de 2018.

En esta ocasión, nos corresponde evaluar la eficacia de una resolución unilateral de un contrato de empleo por tiempo definido en virtud del lenguaje convenido por las partes mediante una cláusula resolutoria unilateral. La controversia ante nuestra consideración, además, nos brinda la oportunidad de examinar la procedencia de un dictamen sumario en un pleito en el que ambas partes circunscribieron sus respectivas solicitudes de sentencia sumaria a la interpretación de ciertas disposiciones contractuales en el contexto de una relación laboral.

**I.**

El 18 de junio de 2007, la Universidad Carlos Albizu, Inc. (UCA) suscribió un contrato de empleo con la Dra. Ileana Rodríguez García (doctora Rodríguez), mediante el cual ésta fue nombrada Presidenta de dicha institución educativa por un término de tres años. Posteriormente, el 1 de diciembre de 2010, las partes suscribieron un segundo contrato de empleo (Contrato) por tiempo definido para que la doctora Rodríguez continuara fungiendo como Presidenta

de la UCA. Específicamente, respecto a la vigencia de dicha relación contractual, la cláusula segunda del Contrato dispuso lo siguiente:

> Este Contrato de Empleo estará vigente desde el 1 de octubre de 2010 hasta el 30 de septiembre de 2013, con revisión en esta fecha y extensión automática por dos (2) años adicionales hasta el 30 de septiembre de 2015, sujeto a las disposiciones sobre terminación de esta relación contractual, las cuales se detallan más adelante en este Contrato.

En cuanto a las disposiciones atinentes a la terminación de la relación contractual aludidas, la cláusula decimoquinta del Contrato estableció lo siguiente:

> Este Contrato de Empleo terminará inmediatamente con el retiro, renuncia o abandono de su empleo por parte de la PRESIDENTA, así como con la muerte ó declaración de incapacidad mental de ésta. Además, este Contrato podrá ser terminado por cualquiera de las PARTES previa notificación escrita a la otra parte con al menos noventa (90) días de antelación a la fecha de terminación, sin la necesidad de que ninguna de las Partes tenga justa causa para tal terminación.

Además de estas causales para la terminación de la relación contractual entre las partes, el Contrato contempló la no renovación de la misma al disponer lo siguiente en la cláusula decimosexta:

> La notificación de no renovación de este Contrato de Empleo será emitida mediante correo certificado a la dirección postal especificada en la cláusula anterior, en o antes de noventa (90) días previos a la terminación de este Contrato. En ausencia de dicha notificación, este Contrato de Empleo será renovado automáticamente por términos de un mes, hasta tanto las PARTES acuerden suscribir un nuevo contrato o la UNIVERSIDAD notifique sobre su intención de no renovación, a tenor con lo dispuesto en la oración anterior, lo que ocurra primero.

Por último, las partes acordaron en la cláusula decimoséptima del Contrato que los términos y condiciones contenidos en éste constituirían la totalidad de éstos y el único acuerdo entre las partes. Asimismo, se pactó en la referida cláusula que "[c]ualquier enmienda subsiguiente a la fecha de vigencia de este Contrato deberá constar por escrito y estar firmada por ambas partes". En cuanto a cualquier potencial conflicto entre disposiciones reglamentarias de la UCA y las cláusulas contractuales pactadas, las partes convinieron mediante la cláusula décimo octava del Contrato que "es la intención de las partes que prevalezca lo dispuesto en este Contrato de Empleo".

Así las cosas, el 27 de junio de 2013, el Presidente de la Junta de Síndicos de la UCA, Sr. Jaime Pla Cortés (señor Pla Cortés), envió una misiva por correo certificado a la doctora Rodríguez en la que expresó lo siguiente:

> Sirva la presente para notificarle que, a tenor con lo dispuesto en su Contrato de Empleo con la Universidad Carlos Albizu, suscrito allá para el 1ro de diciembre de 2010, estamos ejerciendo nuestro derecho a no renovar automáticamente el término de su Contrato que vence el próximo 30 de septiembre de 2013.
> Nuestra decisión obedece a que la evaluación que, por parte de la Junta, al presente se está llevando a cabo aún está en curso y una vez concluya la misma estaremos en posición de tomar una decisión.
> Entendemos que esta evaluación pudiera concluir en o antes del 30 de septiembre de 2013, pero de extenderse le estamos notificando que su contrato de empleo se estará renovando automáticamente de mes a mes hasta tanto se tome una decisión y lleguemos a un acuerdo para la

extensión de su contrato o la no renovación del mismo.[1]

El 26 de septiembre de 2013, el señor Pla Cortés, a nombre de la Junta de Síndicos, envió una segunda misiva a la doctora Rodríguez. En ésta, informó que luego de la notificación previa descrita en el contrato, se había tomado la decisión de no renovar el mismo. Sin embargo, se le indicó en esa comunicación que la Junta de Síndicos tenía interés en entablar conversaciones conducentes a forjar una nueva relación contractual. La doctora Rodríguez, por su parte, ripostó que la Universidad no tenía un derecho a no renovar el Contrato, puesto que la extensión de dos (2) años del mismo operaría de forma automática, según el lenguaje pactado con relación a la vigencia de la relación contractual. Así, la doctora Rodríguez indicó que el Contrato estaba vigente hasta el 30 de septiembre de 2015.[2]

Luego de varias comunicaciones entre las partes respecto a la capacidad de la UCA de no renovar el Contrato y la extensión automática del mismo, el 9 de enero de 2014, la Junta de Síndicos se reunió para discutir el asunto. Ese mismo día, y con efectividad al día 15 de enero de 2014, el señor Pla Cortés envió a la

---

[1] Este documento obra en los autos originales pero no se utilizó como *exhibit* en los escritos presentados por las partes ante el foro primario.

[2] Ninguna de las comunicaciones habidas entre las partes obra en el expediente. Tampoco se utilizaron como *exhibits* en las respectivas solicitudes de sentencia sumaria presentadas ante el foro primario. Su contenido se consigna en la sentencia del Tribunal de Apelaciones, en la que se advierte que "los extractos citados surgen de los escritos estipulados y presentados por las partes ante el tribunal apelado". *Sentencia del TA*, en la pág. 6.

doctora Rodríguez una carta de despido en la que aludió a diferencias irreconciliables en la interpretación del Contrato suscrito entre las partes. De esta manera, culminó de manera definitiva la relación contractual entre la UCA y la doctora Rodríguez.

El 28 de marzo de 2014, la doctora Rodríguez presentó una querella al amparo de la *Ley de procedimiento sumario de reclamaciones laborales*, Ley Núm. 2 de 17 de octubre de 1961, 32 L.P.R.A. sec. 3118 *et seq.*, ante el Tribunal de Primera Instancia. Mediante ésta, alegó que la UCA había incumplido con los términos del Contrato. Además, solicitó que le liquidaran las vacaciones acumuladas. Oportunamente, la UCA contestó la querella y negó las alegaciones en ella contenidas. En esencia, arguyó que había cumplido con las disposiciones relacionadas con la terminación unilateral del Contrato y había notificado adecuada y oportunamente a la doctora Rodríguez sobre su decisión de no renovarlo.

Luego de varios trámites procesales, la doctora Rodríguez solicitó al foro primario que dictara sentencia sumaria a su favor. En su solicitud, expuso que no existían hechos materiales en controversia y que se trataba de un asunto de estricto Derecho que requería la interpretación de las cláusulas contractuales en cuestión. Adujo que el término del contrato era de cinco (5) años, puesto que la cláusula relacionada con la vigencia del mismo establecía que la extensión a cinco (5) años sería automática. Por tal razón, solicitó que se le compensara

por el periodo en el que el Contrato hubiese estado vigente a no ser por el incumplimiento por parte de la UCA con las disposiciones del mismo. En específico, la doctora Rodríguez solicitó al foro primario que ordenara a la UCA resarcir los salarios y beneficios a los que hubiese tenido derecho a partir del 15 de enero de 2014 y hasta el 30 de septiembre de 2015. En su solicitud, la representación legal de la doctora Rodríguez planteó que el Contrato era uno de adhesión y que, consiguientemente, cualquier ambigüedad en su lenguaje debía interpretarse a su favor.

La UCA, por su parte, se opuso a la solicitud presentada y solicitó que se dictara sentencia sumaria a su favor. Según arguyó, el despido de la doctora Rodríguez se había hecho conforme a las cláusulas contractuales relacionadas con la terminación unilateral de la relación de empleo. Acompañó su oposición con los Estatutos de la Universidad para señalar que el término de la presidencia no podía exceder tres (3) años, por lo que la contención de la doctora Rodríguez de que el término del Contrato era de cinco (5) años era improcedente. Según sostuvo, la notificación sobre no renovación cursada a la doctora Rodríguez el 27 de junio de 2013 tuvo el efecto de terminar la relación contractual entre las partes, puesto que mediante la misma se le informó que el Contrato no estaría sujeto a la extensión automática efectiva el 30 de septiembre de 2013.

Evaluados los argumentos de las partes, así como las cláusulas contractuales en controversia, el Tribunal de Primera Instancia dictó sentencia sumaria parcial a favor de la doctora Rodríguez.[3] Al así proceder, declaró con lugar la causa de acción de incumplimiento contractual y ordenó a la UCA pagar a la doctora Rodríguez la cantidad de $398,161.87 por los salarios no devengados, y $59,724 por concepto de honorarios de abogado. El foro primario concluyó que la fecha de terminación del Contrato suscrito entre las partes era el 30 de septiembre de 2015, y no el 30 de septiembre de 2013 como arguyó la UCA. Así, razonó que surgía con "meridiana claridad que el único término definido, contratado y pactado por las partes para la terminación y ante el cual le otorga a la doctora Rodríguez su única expectativa de continuidad en el empleo era el 30 de septiembre de 2015". Ap. en la pág. 119. Ello, puesto que la vigencia de la relación contractual, según pactada por las partes, se extendería automáticamente por dos (2) años a la fecha de expiración del primer término de tres (3) años.[4]

Inconforme con la determinación del Tribunal de Primera Instancia, la UCA presentó un recurso de apelación ante el Tribunal de Apelaciones. Allí, planteó que el foro

---

[3] Durante el trámite del litigio, las partes llegaron a una transacción que puso fin a la causa de acción sobre liquidación de vacaciones. *Véase* Ap. en la pág. 47.

[4] El dictamen del Tribunal de Primera Instancia, además, distinguió el término "extensión" del término "renovación" y abundó en el uso del cualitativo "automática". De esta manera, concluyó que esos términos "no son sinónimos ni se pueden usar indistintamente. Así, con la extensión automática se alarga lo que ya existe, con una renovación se crea algo nuevo".

primario había errado al interpretar el Contrato de tal manera que la vigencia del mismo fuese de cinco (5) años y al imponerle honorarios de abogado por temeridad.

El foro apelativo intermedio confirmó el dictamen recurrido, si bien bajo otros fundamentos. En concreto, el Tribunal de Apelaciones concluyó que, al no haberse suscrito un nuevo contrato de empleo entre las partes efectivo a partir del 1 de octubre de 2013, y en atención a que la doctora Rodríguez continuó fungiendo como Presidenta, la extensión automática de dos (2) años surtió efecto. Razonó ese foro apelativo, además, que "de ninguna manera, la Universidad puede recurrir a la notificación de no renovación de la cláusula decimosexta realizada el 27 de junio de 2013, para invocar la terminación al amparo de la cláusula decimoquinta". Ello, puesto que se trataba de dos disposiciones contractuales independientes con consecuencias distintas para las partes.[5] Al así proceder, el foro apelativo intermedio reconoció la validez de la cláusula resolutoria en cuestión pero concluyó que la UCA

---

[5] La Hon. Migdalia Fraticelli Torres emitió un Opinión Disidente en la que expresó que el mecanismo de sentencia sumaria no era el adecuado para disponer de la controversia entre las partes. Según indicó en su disenso, la sentencia parcial del Tribunal de Primera Instancia omitió una discusión relacionada con la cláusula de resolución unilateral contenida en el Contrato y no identificó adecuadamente la existencia de una controversia de hechos relacionada con la interpretación de dicha cláusula. En esencia, sostuvo que debía dirimirse en un juicio en su fondo si la UCA cumplió con el protocolo establecido para la resolución unilateral del Contrato. Además, la Jueza intimó que, en este caso, cabía la posibilidad de que se hubiese concretado una novación contractual, por lo que era indispensable evaluar la intención de las partes y los actos coetáneos y posteriores de éstas mediante la celebración de un juicio en su fondo.

no había ejercitado adecuadamente su derecho bajo ésta, puesto que la remoción sin justa causa de la Presidenta de la Universidad, conforme a los estatutos, requería el voto mayoritario de la Junta de Síndicos. Razonó, además, que la extensión automática de dos (2) años pactada contractualmente había surtido efecto, toda vez que la doctora Rodríguez continuó fungiendo como Presidenta de la Universidad luego de la expiración del primer término de vigencia contractual.

A diferencia del Tribunal de Primera Instancia, el Tribunal de Apelaciones expuso que procedía interpretar el Contrato suscrito entre las partes como uno de adhesión, por lo que su lenguaje "confuso y hasta incompatible entre sí" debía interpretarse a favor de la doctora Rodríguez, a quien consideró la parte más débil. La reconsideración fue declarada *no ha lugar*.

Insatisfecha con el dictamen del Tribunal de Apelaciones, la UCA recurrió ante este Tribunal mediante un recurso de *certiorari*. Mediante éste, planteó que los foros recurridos habían errado al concluir que el Contrato de empleo suscrito con la doctora Rodríguez no había sido resuelto conforme a las cláusulas contractuales sobre terminación aplicables. La UCA expuso que la notificación de no renovación que le fue cursada a la doctora Rodríguez el 27 de junio de 2013, 95 días antes a la fecha de expiración del término de vigencia del Contrato, había cumplido con la cláusula decimoquinta sobre terminación.[6]

---

[6] Los errores planteados fueron los siguientes:

Además, señaló que, dentro del contexto de la revisión de un dictamen sumario, el Tribunal de Apelaciones había presumido hechos de manera improcedente.

El 29 de abril de 2016 este Tribunal expidió el auto solicitado y, consiguientemente, las partes presentaron sus respectivos alegatos. Así las cosas, la doctora Rodríguez compareció y argumentó ante este Tribunal que la UCA había incumplido con los términos del Contrato al terminar la relación laboral antes de la fecha dispuesta para ello; a saber, el 30 de septiembre de 2015. Sostuvo que la extensión era una automática y que la notificación de no renovación no tuvo el efecto de terminar la relación laboral puesto que la misma tenía un término de cinco (5) años.

La UCA, por su parte, insiste en que ejerció su derecho a la resolución unilateral del Contrato sin justa causa conforme al lenguaje pactado por las partes. Así, indica que, en la medida en que este Tribunal considere que la notificación del 27 de junio de 2013 fue eficaz, el Contrato con la doctora Rodríguez quedó válidamente sin efecto. Explica que una lectura integrada de las cláusulas

---

1. Erró el Honorable Tribunal de Apelaciones al concluir que la notificación para dar por terminado el Contrato de Empleo de la doctora Rodríguez fue inadecuada al ignorar ciertas disposiciones del Contrato y no interpretar las cláusulas del mismo en conjunto.
2. Erró el Honorable Tribunal de Apelaciones al presumir ciertas aseveraciones fácticas que resultan improcedentes dentro del marco procesal de una sentencia sumaria.
3. Erró el Honorable Tribunal de Apelaciones al concederle a la doctora Rodríguez el remedio de salario y beneficios por el plazo de dos años.

contractuales en cuestión apuntan a que es irrelevante si dicha notificación se hizo al amparo de la cláusula decimoquinta (terminación) o la decimosexta (no renovación), puesto que el propio contrato supeditaba la vigencia de la relación contractual a las disposiciones sobre terminación. Según arguye, ambas cláusulas versan sobre la terminación de la relación contractual, independientemente del título de éstas. Bajo ese fundamento, solicita a este Tribunal que revoquemos los dictámenes recurridos. En la alternativa, plantea que la cuantía otorgada a la doctora Rodríguez debe reducirse para que únicamente esté obligada a resarcirle por un término de noventa (90) días luego del 9 de enero de 2014, fecha en la que le envió la carta de despido efectivo el 15 de enero del 2014.

Evaluados los argumentos de las partes, así como los documentos que obran en el expediente y las respectivas solicitudes de sentencia sumaria presentadas por las partes ante el foro primario, estamos en posición de resolver. Para ello, conviene examinar, en primera instancia, los aspectos procesales del presente pleito y la procedencia de un dictamen sumario para disponer del mismo. Ello, en virtud del señalamiento de error de la UCA con relación a la asunción, por parte del Tribunal de Apelaciones, de ciertas aseveraciones fácticas que, según alega, requerirían la celebración de una vista en su fondo.

**II.**

En nuestro ordenamiento, el mecanismo de sentencia sumaria procura, ante todo, aligerar la tramitación de aquellos casos en los cuales no existe una controversia de hechos real y sustancial que exija la celebración de un juicio en su fondo. *Véase Ramos Pérez v. Univisión*, 178 D.P.R. 200 (2010). La Regla 36 de las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. V. R. 36, rige el proceso mediante el cual cualquiera de las partes en un pleito puede solicitar al tribunal que dicte sentencia sumaria a su favor. Cuando cualquier parte reclamante solicite que el pleito sea resuelto por la vía sumaria, deberá demostrar en su solicitud, "la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación". 32 L.P.R.A. Ap. V. R. 36.1, 36.2.   La Regla 36.3 de Procedimiento Civil detalla el procedimiento que deben seguir las partes al momento de solicitar que se dicte sentencia sumaria a su favor. A esos efectos, establece que una solicitud al amparo de ésta deberá incluir: (1) una exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción, reclamación o parte respecto a la cual es solicitada la sentencia sumaria; (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u

otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal;(5) las razones por las cuales debe ser dictada la sentencia, argumentando el derecho aplicable, y (6) el remedio que debe ser concedido. 32 L.P.R.A. Ap. V. R. 36.3. Presentada una solicitud de sentencia sumaria, la parte que se opone a la concesión de la misma también deberá cumplir con ciertos requisitos preceptuados en la referida regla y deberá argumentar el derecho aplicable a la controversia, ya sea para que el pleito no sea resuelto por la vía sumaria, o para que se dicte sentencia sumaria a su favor. Es decir, el hecho de que una parte solicite sentencia sumaria no implica que la misma debe ser resuelta a su favor. Esto es así porque la sentencia sumaria "puede dictarse a favor o en contra del promovente, según proceda en derecho". *Audiovisual Lang. v. Sist. Est. Natal Hnos.*, 144 D.P.R. 563, 575 (1997).

El criterio rector, pues, al momento de considerar la procedencia de un dictamen sumario, es que no haya controversia sobre los hechos esenciales y pertinentes, según alegados por las partes en sus respectivas solicitudes y/o oposiciones, y que sólo reste aplicar el Derecho. *Véanse Velázquez Ortiz v. Mun. de Humacao, 197 D.P.R. 656, 661 (2017); Reyes Sánchez v. Eaton Electrical, 189 DPR 586, 594-595 (2013); SLG Zapata-Rivera v. J.F. Montalvo, 189 DPR 414, 430 (2013); Nieves Díaz v. González Massas, 178 DPR 820, 847 (2010).* En ausencia de una

controversia de hechos materiales discernible, corresponderá a los tribunales aplicar el Derecho y resolver conforme al mismo. En ocasiones anteriores, al evaluar la procedencia de un dictamen al amparo de la Regla 36, hemos concluido que "la regla no excluye tipos de casos y realmente puede funcionar en cualquier contexto sustantivo". *Ramos Perez, supra,* en la pág. 220.

En el presente caso, tanto la doctora Rodríguez como la UCA solicitaron al Tribunal de Primera Instancia que dictara sentencia sumaria a su favor y circunscribieron sus respectivos petitorios a una interpretación del Derecho aplicable; esto es, el Contrato de empleo suscrito entre ellas. De hecho, el único documento que acompañó la Solicitud de Sentencia Sumaria de la doctora Rodríguez fue el propio Contrato. En su oposición, la UCA únicamente presentó una declaración jurada y los estatutos de la Universidad para rebatir la contención de la doctora Rodríguez sobre la vigencia de la relación contractual. Los foros recurridos, al interpretar el lenguaje contractual en cuestión, se ciñeron a los hechos propuestos por la doctora Rodríguez y admitidos por la UCA relacionados con la terminación del empleo de la primera.[7]

---

[7] Como se indicó, aunque bajo fundamentos distintos, ambos foros concluyeron que la UCA incumplió con las disposiciones contractuales relacionadas con la resolución unilateral de la relación contractual. Salvo la Opinión Disidente de la Hon. Migdalia Fraticelli Torres, ninguno de los dictámenes de los foros recurridos aluden a la posibilidad de que, en este caso, haya operado la novación, ya sea en su modalidad extintiva o modificativa. Dado que la UCA no planteó este argumento en ninguno de los escritos que presentó, no nos corresponde, como foro revisor, evaluarlo en sus méritos.

Al interpretar estas cláusulas, ambos foros recurridos determinaron que la UCA había incumplido con las disposiciones contractuales atinentes a la terminación de empleo de la doctora Rodríguez. Como se adelantó, de una parte, el foro primario concluyó que el término de vigencia del Contrato era de cinco (5) años, conforme a la extensión automática pactada. De otra parte, el Tribunal de Apelaciones concluyó que, si bien el término de vigencia original era de tres años, la UCA incumplió con los protocolos pactados para resolver unilateralmente la relación contractual bajo la cláusula decimoquinta del Contrato.

Examinados los documentos de autos, así como las solicitudes de sentencia sumaria presentadas por las partes, coincidimos con los foros recurridos en que, de los hechos, según expuestos por las partes, no surgía una controversia material que imposibilitara un dictamen sumario. Más bien, la controversia trabada requería interpretar el lenguaje contractual y dirimir las consecuencias jurídicas de los hechos, por lo que el uso del mecanismo de sentencia sumaria en este caso era adecuado. Aclarado este asunto, procede evaluar la interpretación que hicieran los foros recurridos de las cláusulas contractuales en cuestión. Veamos.

### III.

Bajo la teoría general de obligaciones y contratos, las partes contratantes "pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente,

siempre que no sean contrarios a las leyes, la moral, ni al orden público". Cód. Civ. PR art. 1207, 31 L.P.R.A. Sec. 3372. Este articulado recoge el principio de la autonomía de la voluntad o libertad de contratación que rige en nuestra jurisdicción. A tenor con este principio, las partes se obligan a todos los extremos de lo pactado siempre que ello sea conforme a la ley, la moral y el orden público. Este vínculo contractual tiene sus límites en la voluntad expresa de las partes y, claro está, en todo aquello que sea derivado de las expectativas razonables de lo que la buena fe dicta respecto a la relación contractual. *Véase PaineWebber Inc. of Puerto Rico v. Service Concepts, Inc.*, 151 D.P.R. 307, 311 (2000).

Una vez las partes acuerdan esos pactos, cláusulas y condiciones mediante un contrato, están obligadas a cumplir con las mismas. Esto es así porque "[l]as obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes, y deben cumplirse al tenor de los mismos", Cód. Civ. PR art. 1044, 31 L.P.R.A. Sec. 2994. Este principio de *pacta sunt servanda* impone a las partes contratantes la exigencia de cumplir con lo pactado pues supone la inalterabilidad de los acuerdos contenidos en el contrato.

En el pasado, hemos reconocido la validez de la inclusión de cláusulas resolutorias unilaterales en los contratos, determinando que las mismas no contravienen lo dispuesto en el Artículo 1208 del Código Civil, 31

L.P.R.A. sec. 3373 ("La validez y el cumplimiento de los contratos no pueden dejarse al arbitrio de uno de los contratantes".). Específicamente, hemos resuelto que las cláusulas que permiten la terminación de una relación contractual conforme a la voluntad de cualquiera de las partes están en perfecta armonía con el principio de *pacta sunt servanda*. Véase *Flores v. Municipio de Caguas*, 114 D.P.R. 521, 528, 529 (1983). En ese contexto, hemos establecido que la prohibición de que el cumplimiento de un contrato quede al arbitrio de una de las partes no impide que los contratantes incluyan cláusulas que permitan la terminación de la relación contractual a base de la voluntad de cualquiera de ellas. Véanse *Casanova Díaz v. Puerto Rican-American Insurance Company,* 106 D.P.R. 689, 695 (1978); *Figueroa Piñero v. Miranda & Eguía,* 83 D.P.R. 554, 555-557 (1961); *Arecibo Motors Co. v. Caribe Motors Corp.,* 60 D.P.R. 401, 407, 409 (1942).

La validación jurisprudencial de las cláusulas resolutorias –unilaterales y bilaterales– da cuenta de la distinción que existe entre la validez de un contrato y su duración. En efecto, en *Flores v. Municipio, supra*, reconocimos que "una cosa es que una parte tenga la facultad de decidir si el contrato existe o no, si está obligada o no lo está, y otra que exista un contrato válido cuyo término dependa exclusivamente de la voluntad de una de las partes". *Id.* en la pág. 528. Consiguientemente, aclaramos que la prohibición contenida en el Artículo 1208 del Código Civil "sólo alcanza al

primero de estos supuestos. En cuanto al segundo, la obligación contraída subsiste con todos sus efectos legales hasta que la parte así facultada decida ponerle fin". *Id.*

La interpretación por parte de los tribunales de este tipo de cláusulas resolutorias, como ocurre con cualquier otro tipo de cláusula contractual, se rige por lo dispuesto en el Artículo 1233 del Código Civil, el cual preceptúa que "[s]i los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas". 31 L.P.R.A. sec. 3471. De otra parte, el referido artículo establece que "[s]i las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerá ésta sobre aquéllas". *Id.* Cónsono con este articulado, evaluar la claridad de un contrato presupone concordar su letra con la intención de las partes. *Véase* Marcial v. Tomé, 144 D.P.R. 522 (1997). Este proceso de análisis requiere una "valoración de las palabras y de la congruencia que con la voluntad guardan". Id. (*citando a* S. del 9 de diciembre de 1965, Núm. 5603, XXXII (Vol. II) Repertorio de Jurisprudencia 3433).

En el presente caso, las partes suscribieron una cláusula resolutoria que le brindaba a ambas la oportunidad de resolver el Contrato sin justa causa en cualquier momento durante la vigencia de la relación contractual. El ejercicio de ese derecho, conforme al texto de la cláusula decimoquinta del Contrato, sólo

requería "previa notificación escrita a la otra parte con al menos noventa (90) días de antelación a la fecha de terminación". Es decir, en virtud de este precepto contractual, tanto la doctora Rodríguez como la UCA podían resolver unilateralmente la relación contractual siempre y cuando notificaran a la otra parte esta determinación noventa días antes de la fecha en la que se proponían terminar la misma. A todas luces, y contrario a lo que argumenta la doctora Rodríguez en sus escritos, este derecho podía ejercitarse en cualquier momento y no únicamente noventa (90) días antes de la fecha de terminación pactada en la cláusula sobre vigencia contractual. Ciertamente, esta interpretación haría de la cláusula una completamente superflua.

La inclusión en el Contrato de empleo suscrito entre la partes de esta cláusula resolutoria es completamente válida y cónsona con la jurisprudencia anteriormente reseñada. Corresponde entonces determinar si la UCA resolvió unilateralmente la relación de empleo conforme a lo expresamente pactado en el Contrato o si, por el contrario, incumplió con los términos del mismo y, consecuentemente, debe resarcir a la doctora Rodríguez por los salarios y beneficios dejados de percibir a partir de la fecha en la que la UCA finalmente dio por terminada la relación contractual; esto es el 15 de enero de 2014. Este análisis requiere una lectura integrada de las cláusulas aplicables y las consecuencias de cada una en lo que

respecta la vigencia del Contrato y la terminación del mismo.[8]

## IV.

## A.

El Contrato suscrito entre la doctora Rodríguez y la UCA contemplaba varias maneras en que la relación contractual podría culminar. En primer lugar, el Contrato podía terminar inmediatamente con el retiro, renuncia o abandono de su empleo por parte de la doctora Rodríguez, así como con la muerte o declaración de incapacidad de ésta. En segundo lugar, el Contrato le confirió a la UCA el derecho a dar por terminada la relación laboral con la doctora Rodríguez en cualquier momento, sin previo aviso y de manera inmediata en caso de violación por parte de ésta a las normas éticas aplicables a su profesión, negligencia crasa en el cumplimiento de sus deberes o si ésta era acusada, se declaraba culpable o era sentenciada por la comisión de algún delito a nivel estatal o federal. Tercero, el Contrato también contempló distintas instancias que constituirían justa causa para la remoción inmediata de la doctora Rodríguez. Expresamente se dispone, sin embargo, que cualquier caso de terminación por justa causa requeriría el voto mayoritario de la Junta de Síndicos.

---

[8] Coincidimos con la parte peticionaria en lo atinente a la improcedencia de interpretar el Contrato suscrito entre las partes como uno de adhesión cuando, en el contexto particular de un dictamen sumario, no se ha pasado prueba sobre ese aspecto de la relación contractual. No obstante, el ámbito de la revisión judicial abarca el resultado y no los fundamentos, por lo que prescindimos de una discusión exhaustiva sobre este asunto.

Según se desprende de lo anterior, las partes pactaron distintas razones por las cuales la relación contractual podría terminar -por justa causa- previo a que venciera el término de vigencia del Contrato. Todas estas causales están contenidas en la cláusula decimoquinta, la cual también recoge la cláusula resolutoria unilateral sin justa causa, otra manera en la que la relación contractual podía terminar. Esta cláusula resolutoria, como se adelantó, permitía a las partes dar por terminada la relación contractual sin justa causa para ello, siempre y cuando mediara notificación adecuada. La consecuencia inmediata del ejercicio del derecho conferido a las partes mediante esa cláusula es que serían puestas en aviso sobre la terminación de la relación contractual con noventa (90) días de antelación. Una vez transcurrido ese término, la relación contractual terminaría.

La última -y más natural o evidente- manera en la que sería efectiva la terminación de la relación contractual entre la doctora Rodríguez y la UCA sería por el transcurso del término de vigencia pactado. En cuanto a esto, la cláusula segunda del Contrato estableció que el mismo estaría vigente hasta el 30 de septiembre de 2013, "con revisión en esta fecha y extensión automática por dos (2) años adicionales hasta el 30 de septiembre de 2015". Este término, a su vez, estaría "sujeto a las disposiciones sobre terminación de esta relación contractual", las cuales fueron discutidas en los párrafos que preceden.

Las partes interpretan esta cláusula relativa a la vigencia del Contrato de maneras distintas. La doctora Rodríguez, por su parte, estima que la extensión de la relación contractual operaría de forma automática, por lo que la fecha real de terminación del Contrato era el 15 de septiembre de 2015. La UCA, sin embargo, considera que la extensión no estaba supuesta a operar automáticamente y que, dado que la vigencia del Contrato estaba subordinada a las disposiciones sobre terminación, al informar a la doctora Rodríguez su intención de no renovar automáticamente el mismo —esto es, no extenderlo hasta el 30 de septiembre de 2015— ejercitó su derecho a la resolución unilateral pactada en la cláusula decimoquinta del Contrato. Apoyan esta contención con el hecho de que la notificación de no renovación se hizo con noventa y cinco (95) días de anticipación al 30 de septiembre de 2013.

Recordemos que, en lo atinente a la no renovación de la relación contractual transcurrida su vigencia, el Contrato establecía, en su cláusula decimosexta, que "[l]a notificación de no renovación de este Contrato de Empleo será emitida mediante correo certificado . . . en o antes de noventa (90) días previos a la terminación de este Contrato". La cláusula también establece que, "[e]n ausencia de dicha notificación" el Contrato sería renovado automáticamente por términos de un mes, hasta tanto las partes acordaran suscribir un nuevo contrato o la UCA

notificara sobre su intención de no renovar el mismo conforme al protocolo establecido para ello.

De una lectura integrada de esta cláusula del Contrato referente a la notificación de la no renovación surge con meridiana claridad que la misma es completamente distinguible de la cláusula que enumera las causales para la terminación de la relación contractual. Esta realidad ciertamente derrota la contención de la UCA a los efectos de que "resulta irrelevante si la notificación del 27 de junio de 2013 se hizo al amparo de la cláusula decimoquinta o decimosexta del Contrato". *Certiorari*, en la pág. 10. A todas luces, las consecuencias jurídicas del ejercicio de las obligaciones contenidas en cada cláusula son distintas: mientras que una notificación de terminación al amparo de la cláusula decimoquinta pondría fin a la relación contractual entre las partes en cualquier momento, una notificación al amparo de la cláusula decimosexta derivaría en el fin de la relación contractual en la fecha pactada contractualmente, puesto que ésta no estaría sujeta a renovación.

Conviene destacar, además, que el lenguaje claro del Contrato únicamente contempla la renovación automática de la relación contractual por términos sucesivos de un mes **en ausencia** de una notificación sobre la no renovación del Contrato.[9] En esa eventualidad, como se indicó, la cláusula decimosexta estableció que la renovación

---

[9] Como se relató en la relación de hechos, en este caso, la renovación mensual automática surtió efecto a pesar de que se le notificó a la doctora Rodríguez la no renovación.

automática se extendería hasta tanto las partes acordaran suscribir un nuevo contrato o, en la alternativa, hasta que la UCA notificara su intención de no renovar el mismo, conforme a los requisitos sobre la notificación de no renovación expuestos en esa misma cláusula.[10]

**B.**

Ahora bien, la obligación de notificar la no renovación del Contrato dispuesta en la cláusula decimosexta es contingente a la fecha de terminación de la relación contractual. Como se adelantó, las partes divergen en su interpretación sobre la duración del Contrato en cuestión y el significado de los términos "extensión automática" contenidos en la cláusula segunda de éste. Tal y como interpretaron los foros recurridos, las palabras "extensión" y "renovación" ciertamente no son sinónimos. Un examen de sus distintas acepciones apuntan a que una extensión presupone una continuidad temporal; esto es, "ocupar cierta cantidad de tiempo, durar". Diccionario de la lengua española, Real Academia Española, Vol. I (22da ed. 2001), en la pág. 1024. En contraste, la palabra "renovación" presupone una sustitución o un restablecimiento; "[s]ustituir una cosa vieja, o que ya ha servido, por otra nueva de la misma clase", o "hacer como

---

[10] De este lenguaje contractual surge que una vez se activara la renovación automática de mes a mes que operaría ante la ausencia de una notificación de no renovación y en el caso en que las partes no acordaran una nueva relación contractual, la doctora Rodríguez permanecería en su posición por un término mínimo de noventa (90) días.

de algo nuevo, o volverlo a su primer estado". *Id.*, Vol. II, en la pág. 1945.

Del lenguaje contractual pactado surge que la cláusula segunda sobre la vigencia del Contrato sólo hace referencia al término extensión, mas no así al término renovación. El uso del calificativo "automática", además, denota que la intención de las partes era que la extensión surtiera efectos sin que fuese necesario un acto afirmativo ulterior, es decir "sin necesidad de la intervención directa del interesado". Si bien la cláusula alude a una "revisión en esta fecha", el uso de la conjunción "y" permite colegir que, del lenguaje pactado, no surge que las partes condicionaron la ocurrencia de un evento al otro sino más bien la concurrencia de ambos en una fecha en particular: el 30 de septiembre de 2013. **Correspondía a la UCA, según se obligó, revisar el Contrato el 30 de septiembre de 2013. El incumplimiento por parte de la UCA con esa obligación no puede, bajo ninguna circunstancia, excluir la ocurrencia de un evento independiente: la extensión de la vigencia de la relación contractual.**

Debido a que lo que se pactó en la cláusula segunda fue una "extensión automática" del término de vigencia del Contrato y no una "renovación automática" del Contrato en sí, la intención de no renovación por parte de la UCA cursada el 27 de junio de 2013 **no tuvo el efecto de terminar la relación contractual habida entre**

**las partes**. Mucho menos cuando la doctora Rodríguez continuó fungiendo como Presidenta de la Universidad hasta el 15 de enero de 2014.[11] Conviene señalar que, en el primer Contrato de empleo suscrito en el 2007, las partes no acordaron una extensión automática. No obstante, sí pactaron una disposición similar a la contenida en la cláusula decimosexta del Contrato suscrito en el 2010 que imponía a la UCA la obligación de notificar la no renovación de la relación contractual con treinta (30) días de anticipación. En ese primer contrato, sin embargo, no se pactó la renovación automática de mes a mes que sí se pactó en la cláusula decimosexta del segundo Contrato y la cual surtiría efecto en ausencia de una notificación de no renovación. **Ciertamente, la inclusión de estas cláusulas en ambos contratos responde a un reconocimiento implícito de una expectativa de renovación.** Más aún, cuando en el segundo Contrato se incluyó la renovación automática culminada la fecha de vigencia de la relación contractual si no se

---

[11] Resulta preciso advertir que, tanto en su solicitud de sentencia sumaria como en el recurso de *certiorari* presentado ante este Tribunal, la UCA acomodaticiamente omite este hecho tan crucial sobre la permanencia de la doctora Rodríguez como Presidenta luego del 30 de septiembre de 2013 y hasta el 15 de enero de 2014. De esta manera, induce a error a este Foro al sostener que la notificación de no renovación fue eficaz y, en virtud de ella, "el Contrato de la doctora Rodríguez quedó entonces válidamente sin efecto". *Certiorari*, en la pág. 11. Asimismo, la UCA solamente alude al contenido de la carta cursada el 27 de junio de 2013 en el que se le indica a la doctora Rodríguez que la Universidad está ejerciendo su derecho a no renovar automáticamente el Contrato. No obstante, omite el resto de la comunicación, en la que se le informa que el mismo sería renovado automáticamente por términos de un mes.

le notificaba a la doctora Rodríguez con noventa (90) días de antelación que no se renovaría el mismo.

En el segundo Contrato suscrito, las partes muy bien pudieron haber sujetado la extensión a la concreción de la revisión de los términos del Contrato, cualesquiera que fuesen. Igualmente, pudieron haber sustituido la palabra "extensión" por "renovación", dado que por primera vez se acordó una renovación automática de mes a mes vencido el término de vigencia contractual. No lo hicieron. Por el contrario, pactaron la extensión automática de la vigencia del Contrato y la renovación automática de mes a mes **<u>únicamente</u>** cuando no se le notificara a la doctora Rodríguez que el Contrato no sería renovado transcurrida su vigencia.

Los hechos reseñados evidencian palmariamente que, en este caso, no se configura ninguno de los escenarios descritos en la cláusula decimosexta sobre no renovación y/o renovación automática. Esto es así puesto que: (1) la doctora Rodríguez **sí fue notificada** de la intención de la UCA de no renovar su Contrato; (2) a pesar de esa notificación, la UCA le indicó que trabajaría de mes a mes, hasta tanto ocurriera la revisión pactada o se determinara que el Contrato no sería renovado; (3) la UCA nunca envió otra notificación de no renovación una vez la doctora Rodríguez continuó fungiendo como Presidenta por términos sucesivos de un mes hasta que, el 9 de enero de 2014, le envió una carta de despido que puso fin a la

relación contractual entre las partes con tan sólo cinco (5) días de notificación.

A fin de cuentas, aún si equiparáramos los términos "renovación" y "extensión", la notificación cursada el 27 de junio de 2013 no tuvo el efecto de terminar la relación contractual entre las partes efectivo el 30 de septiembre de 2013 como sostiene la UCA. Por el contrario, mediante esa notificación se le indicó a la doctora Rodríguez que el Contrato se estaría renovando automáticamente de mes a mes, algo que únicamente podía ocurrir, según los términos del Contrato, en la eventualidad en que la UCA **no notificara** oportunamente su decisión de no renovar el mismo. La pretensión de la UCA es que hagamos caso omiso al lenguaje contractual pactado en la cláusula decimosexta y determinemos que la notificación de no renovación tuvo el efecto dar por terminada la relación contractual, a pesar de que la doctora Rodríguez continuó sus labores como Presidenta por más de tres meses luego del 30 de septiembre de 2013.

De otra parte, los hechos tampoco evidencian que la UCA haya ejercido su derecho a terminar unilateralmente la relación contractual al amparo de la cláusula decimoquinta del Contrato. Según discutido, conforme al texto de esta cláusula resolutoria, la UCA debía notificar, con noventa (90) días de antelación, su intención de dar por terminada la relación contractual. Este derecho podía ejercitarse en cualquier momento, por lo que la fecha de vigencia del Contrato resulta inmaterial al momento de determinar si se

ejerció adecuadamente. En este caso, sin embargo, en la carta del 27 de junio de 2013 no se le indicó a la doctora Rodríguez que la relación contractual terminaría, sino que la misma se renovaría de mes a mes hasta tanto se completara la revisión del Contrato y se llegara a una determinación con relación a su extensión o no renovación. Posteriormente, cuatro (4) días antes del 30 de septiembre de 2013, la UCA le indicó a la doctora Rodríguez que no renovaría su Contrato.

Finalmente, mediante carta fechada el 9 de enero de 2014, la UCA le informó a la doctora Rodríguez que su último día como Presidenta de la Universidad sería el 15 de enero de 2014. Sólo mediante esta última carta la UCA pudo haber ejercido su derecho a resolver unilateralmente el Contrato sin justa causa al amparo de la cláusula decimoquinta sobre terminación. Sin embargo, dado que estableció como fecha de terminación el 15 de enero de 2014, incumplió con el requisito de notificación previa de noventa (90) días pactada contractualmente. Justamente en reconocimiento de este incumplimiento, la UCA nos solicita, como remedio en la alternativa, que reduzcamos la cuantía concedida a la doctora Rodríguez a los salarios y beneficios que hubiese devengado por un término de noventa (90) días a partir del 9 de enero de 2014. La solicitud de ese remedio ignora la razón de ser de este tipo de cláusulas, máxime en el contexto de un contrato de empleo. La función del término de noventa (90) días es proveer a ambas partes un periodo de tiempo razonable para

ajustarse a las consecuencias de la resolución contractual. Así, lo que se persigue es garantizar el cumplimiento con el requisito de notificación previa y no establecer un referente cuantificable para resarcir al perjudicado por un incumplimiento con dicho término.

**V.**

Por los fundamentos que anteceden, concluimos que el Tribunal de Apelaciones no erró al determinar que la UCA incumplió con las disposiciones contractuales relacionadas con la terminación del Contrato. Consiguientemente, tampoco erró al confirmar la cuantía correspondiente a los salarios y beneficios que no fueron devengados por la doctora Rodríguez a partir del 15 de enero de 2014 como consecuencia del incumplimiento contractual por parte de la UCA. Una interpretación cabal de las cláusulas contenidas en el Contrato suscrito entre las partes demuestra, sin lugar a dudas, que la UCA no ejerció su derecho a la resolución unilateral pactada de manera eficaz. Por tal razón, confirmamos el dictamen recurrido.

Se dictará sentencia de conformidad.

Anabelle Rodríguez Rodríguez
Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ileana Rodríguez García

    Recurrida

      v.                      **Núm.** CC-2016-0028

Universidad Carlos Albizu, Inc.

    Peticionaria

SENTENCIA

En San Juan, Puerto Rico a 9 de agosto de 2018.

Por los fundamentos que anteceden, concluimos que el Tribunal de Apelaciones no erró al determinar que la Universidad Carlos Albizu, Inc. (UCA), incumplió con las disposiciones contractuales relacionadas con la terminación del Contrato. Consiguientemente, tampoco erró al confirmar la cuantía correspondiente a los salarios y beneficios que no fueron devengados por la doctora Rodríguez a partir del 15 de enero de 2014 como consecuencia del incumplimiento contractual por parte de la UCA. Una interpretación cabal de las cláusulas contenidas en el Contrato suscrito entre las partes demuestra, sin lugar a dudas, que la UCA no ejerció su derecho a la resolución unilateral pactada de manera eficaz. Por tal razón, confirmamos el dictamen recurrido.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez y el Juez Asociado señor Estrella Martínez no intervinieron. La Juez Asociada señora Pabón Charneco no interviene.

Juan Ernesto Dávila Rivera
Secretario del Tribunal Supremo